St. Paul & Sioux City Railroad Company *vs.* F. S. McDonald and another.

October 7, 1885.

**Contract between Railroad Company and Stockholders relating to Land Grant, held a Mortgage.**—An agreement (set forth in the opinion) between the plaintiff, a railroad corporation, and its individual stockholders, whereby certain rights were conferred upon the latter in respect to a portion of the lands (land grant) of the corporation, considered, and construed as not bearing upon its face the legal import of absolutely conferring upon the stockholders the legal or equitable title to the lands, but rather as affording a security in the nature of a mortgage.

**Same—Exemption of Land from Taxation—Real Intention of Contract to Govern.**—If the real intention of the parties was in accordance with the agreement, legally construed,—that is, as averred by the plaintiff, merely to afford security for an indebtedness of the corporation to its stockholders in the manner specified in the agreement,—the transaction would not constitute a contract for the sale of the land, or a conveyance of the same, so as to remove the exemption from taxation which attached to the land while it remained the property of the corporation. But an act of the corporation conferring upon its stockholders the entire beneficial interest in the land, even though the bare legal title is retained by the corporation, would remove the exemption and subject the property to taxation. So, if the transaction was intended by the parties to effect-

ually confer upon the stockholders such interest in the property, but a form of ownership, or a declared equity of redemption, was reserved for the purpose of preserving the exemption from taxation, the purpose being fraudulent as to the state, the reservation would be ineffectual, and the land would become taxable.

**Same—Intention, How Determined.**—The issues in the case involving the question of fact as to whether or not the real intention of the parties was to invest the stockholders with the entire beneficial interest in the land, and to preserve a mere form of ownership in the corporation, in order that the exemption from taxation might be continued, the determination as to the right of the state to tax the land does not depend alone upon the terms and the mere legal construction of the agreement. The determination of the issue may be affected by a consideration of the circumstances of the transaction, such as the fact of indebtedness from the corporation to its stockholders, (it being averred that the transaction was intended as a means of securing an alleged indebtedness,) the value of the property, the conduct of the parties, etc.

**Same—Finding unsupported by Evidence.**—A finding by the court to the effect that the real intention of the parties was to afford security for an indebtedness of the corporation to its stockholders, and not that the property should pass absolutely to them, *held* erroneous, there being no evidence to support the controverted fact of an existing indebtedness.

**Same—Mortgage given as a Bonus.**—This error considered material, although such a security might have been given for a mere bonus or gratuity, if in good faith, without rendering the land taxable.

Appeal by defendants from an order of the district court for Hennepin county, *Young,* J., presiding, refusing a new trial.

*William J. Hahn,* Attorney General, and *J. M. Martin,* for appellants.

*Greenleaf Clark* and *W. S. Pattee,* for respondent.

DICKINSON, J. It is understood, from statements made before the court at the time of the argument of this cause, that no objection has been made as to the propriety of the form of the action resorted to as a means of securing a determination of the matter in controversy, and therefore we do not consider it.

In the year 1881 the defendant McDonald, the auditor of Hennepin county, caused the tract of land to which the issue relates to be assessed for taxation, and the ordinary proceedings to impose taxes

upon the land for that year were being carried forward when this action was instituted to restrain such proceeding, upon the ground that the property was exempt from taxation. After a trial of the cause, and upon findings of fact by the court, judgment was directed for the relief sought. A motion for a new trial, upon the grounds that the decision was not justified by the evidence and was contrary to law, was denied, and the defendants appealed.

The land is a part of the lands granted by congress and subsequently transferred to the plaintiff to aid in the construction of its line of road. These lands, as originally held by the corporation, were confessedly exempt from taxation. The only controversy is as to whether, through a transaction presently to be referred to, a portion of these lands, including the land in question, have been "contracted to be sold, conveyed or leased by said company," within the proper meaning of that language, which, as found in Laws of 1865, c. 15, expressly limits the exemption from taxation. This issue is to be determined by the construction, intent, and effect of the transaction now to be stated.

In 1871 an agreement was executed in writing in behalf of the corporation, and under its seal, which, for the declared purpose of providing means for the payment of the debts of the company incurred in the construction of its road, provided for the issuing by the corporation of 24,400 shares of so-called "special stock," of the nominal or par value of $100 each. This stock was to be issued and delivered to each holder of the common stock upon payment of such sum as should be required by the company, each stockholder thus to receive the same number of shares of the special stock as he held of the common stock of the corporation. The special stock was not to entitle the holder of it to vote, or in any manner participate in the business, property, or management of the corporation, nor to receive any benefit or dividend from any of its property, except from the lands, as provided in the agreement. The holders of this stock were, however, entitled to receive a half-yearly "dividend" upon it of $3\frac{1}{2}$ per cent., payable from the proceeds of the sales of the lands specified in the agreement. William R. Marshall was designated in the agreement as trustee for the holders of the special stock.

The agreement further provided that 400,000 acres of the land grant should be set apart and appropriated to the payment of the specified dividends upon, and the final payment and extinction of, the amount of such special stock. An irrevocable power of attorney was made to E. F. Drake, authorizing him, as the attorney in fact of the corporation, to contract, sell, and convey these lands, or any of them, at discretion, and to apply the proceeds to the payment of dividends due upon the special stock, and of the principal amount thereof. Provision was made for the election of trustees by the holders of the special stock, and such trustees were to have control of the lands so set apart. They were empowered at pleasure to remove all officers or agents employed in the management of the lands, and to appoint others; to remove the designated trustee and attorney in fact, and to appoint their successors; to determine at what rate and to what extent the special stock might be received in payment for lands at their appraised value, "and from time to time to alter or discontinue the sales and conditions for receiving the same;" to control and direct the attorney in fact as to the price and manner of selling lands. Through such attorney they might grant rights of way for improvements, compromise claims, make releases, and generally do all such acts as the owners of the lands might do. Until such trustees should be chosen, however, the board of directors of the corporation was to have the power which was conferred upon such trustees. The declared intent of the agreement was further expressed to be that the special stock should be issued, based on the land, and the land sold by the attorney in fact, as trustee under the board of directors of the corporation, or the trustees to be chosen by the holders of the special stock, and the proceeds applied to pay dividends, and the surplus from time to time to be distributed to pay the principal of such stock.

By section 12 of this instrument it is provided that "when funds shall arise from the sale of lands sufficient to pay all dividends on said stock, and to refund to the holders the par value thereof, this agreement shall be discharged, and the stock hereby created considered cancelled, * * * and the lands remaining unsold, or funds arising from sales undistributed, whether of money or choses in action, shall belong to the St. Paul & Sioux City Railroad Company, or its lawful

assigns. It is further agreed that said St. Paul & Sioux City Railroad Company may at any time, after giving thirty days' notice * * * of the time and place, redeem and retire any part or all of the stock issued under this agreement, by paying to the holders * * * the par value of said stock, and the accrued dividend thereon ; * * * and whenever all the said stock shall have been so redeemed, or funds shall have been deposited at a place for their redemption, to be approved by the trustees hereinbefore named, all the provisions of this agreement shall become void, and all of said lands, and the proceeds thereof, shall be discharged and free from the lien or incumbrance hereof as fully as if these presents had never existed."

It is further stipulated in this agreement that the corporation shall not sell, mortgage, or incumber the lands, and that it will, "whenever required by said attorney, or by the trustee herein provided for, make such further writings, mortgage, or lien on said lands in favor of said stock, and for the benefit of the holders thereof, as may be devised, advised, or required to perfect and secure the holders thereof in the benefit of said lands as herein provided."

The scheme of which the above outline has been given was carried into effect. The trustee named accepted the trust. Four hundred thousand acres of land were designated for the purposes set forth in the agreement, which included the tract of land in question. The special stock was issued to and taken by the holders of the common stock, share for share, as contemplated by the agreement; one dollar per share, the price fixed, being paid for the same. A part of the designated lands have been disposed of pursuant to the provisions of the agreement. The remainder, including the particular tract in question, are still held, as we understand, undisposed of, and affected only by the terms of the agreement.

There is no controversy as to the power of the corporation to issue the so-called special stock, to make the agreement referred to, and to impose such a charge upon, or make such disposal of, the lands as this agreement may be deemed to have accomplished. The contention is as to the effect, not as to the validity, of the peculiar appropriation which has been made of the land. The allegations of

the complaint are, among other things, to the effect that the intention sought to be accomplished by this transaction was to afford security merely, of the nature of a mortgage, to the stockholders of the corporation for an indebtedness of the corporation to them on account of money advanced by them for proper corporate purposes, in addition to the amounts paid upon subscriptions to the capital stock. By the answer, the fact of such indebtedness and the alleged intention are put in issue, and it is averred, in substance, that the intention was by this transaction to confer upon the holders of the special stock the entire interest of the corporation in the lands, and at the same time to avoid the appearance of a sale or conveyance thereof, in order that the lands might remain exempt from taxation while held by the stockholders.

As we proceed we should avoid misconception as to the nature of this special stock, and bear in mind the relations of the holders of the capital stock to the corporation and to its property. The so-called special stock was not in any proper sense stock of the corporation which created it. It conferred upon the holders of it no interest of any kind in the corporation, or in the business which it was created to transact. They could not, by virtue of being holders of such stock, participate in any manner in the management of the corporation or of its affairs, nor derive any profit or income from the prosecution of the corporate business. The interest or benefit conferred and acquired through this stock was confined to certain lands, the property of the corporation, and was of a nature such as the corporation might grant to any stranger.

The term "stock" is not fitly employed to designate the right or interest which was thus conferred by the corporation upon its individual stockholders. Any other manner of evidencing the amounts for the payment of which the lands may have been appropriated, or of evidencing the interest of the holders of the so-called special stock in the lands to which it related, might as well have been employed. It will be convenient, however, to continue to use the term "special stock" as it is employed in the agreement.

The land which is the subject of this agreement was the property of the corporation, and not, in any proper legal sense, the property of

the holders of its capital stock.   *Queen* v. *Arnaud*, 9 Q. B. 806, 817; *City of Utica* v. *Churchill*, 33 N. Y. 161, 237.   The members of a corporation are, of course, interested in the corporate property; they may derive individual benefit from its use by the corporation or from its proceeds, yet they are not the owners of it; they have no power to transfer or dispose of it, nor to appropriate it to their own use.   The agreement respecting these lands of the railroad company was between parties legally distinct,—the corporation, and the individuals who were members of it.   If, by the transaction under consideration, the corporation divested itself of its property in the lands and conferred the same upon its individual stockholders, it would be as effectual, as an alienation rendering the lands taxable, as though the transaction had been with strangers.   The corporation would become divested of its property in the lands to the same extent that its stockholders as individuals should acquire such interest.

The real intention of the parties has been properly made an issue of fact in this case, and constitutes the principal question to which argument on the part of the state has been directed.   The mere form or terms of the instrument by which the title is affected should not alone determine the power of the state to tax the lands.   If the corporation has conferred upon its individual stockholders the entire beneficial interest in the property, even though it still retains the bare legal title, the exemption from taxation, which was created for the benefit and to serve the purposes of the corporation, should cease. *State* v. *Winona & St. P. R. Co.*, 21 Minn. 472.   And if it were true, as the fact is claimed to be on the part of the state, that the corporation, while actually intending to confer upon its members, and they to receive, all its beneficial interest in the lands, had reserved a form of ownership, a formal right of redemption, only for the purpose of preserving the exemption from taxation, in respect to which it had no longer any real concern, the purpose being fraudulent as to the state, the reservation would be ineffectual.

In determining the rights of the state with respect to taxation, that would be regarded as done which in good conscience ought to be done.   The real purpose to transfer the property would be given effect; the purpose, by reserving a mere form of ownership, to defraud the

state of taxes which it has a right to exact from the property of the individual owners, would be set at naught. In such case the land should be taxed as the property of the individuals. But if the transaction in question is to be construed and was intended to be an appropriation of the land only as security for an indebtedness of the corporation to its stockholders, that alone would not render the land taxable; and, as to this, we do not understand that anything is asserted to the contrary. The form in which such security may have been given is not important, except as bearing upon the question as to what was the intention of the parties and the real nature of the transaction. If that was in its nature a mortgage only, it is not material, as affecting the question under consideration, whether the object was accomplished through the ordinary form of a mortgage; or by a trust deed, with a power of sale, which is the more common form of railroad mortgages; or by a mere agreement by which the land was appropriated as security.

The finding of the court as to the fact last referred to was in accordance with the averments of the complaint; that is, in substance, that the transaction was intended merely as security for an indebtedness of the corporation to its stockholders; that it was not the intention that the land should become the property of the stockholders, but that it should remain the property of the corporation, to be disposed of, however, and the proceeds applied as specified in the agreement. Reading the agreement as expressing the real intention of the parties, we are of the opinion that it does not bear upon its face the legal import of absolutely conferring upon the stockholders of the corporation the legal or equitable title. While large and extraordinary powers are given to them respecting the control, appropriation, and disposition of the property, yet the specifically declared purpose and intent of the agreement, and the expressed right of redemption, give to the instrument, upon its face, the character of a mortgage, or an appropriation of the land as a security, rather than of an absolute alienation. It is true, as has been suggested, that the stockholders were empowered, while the land remained unredeemed, and upon an appraisal of values to be made by trustees of their own choosing, to surrender their special stock, and to take land in payment of it. But

whatever may be the influence of this and of other provisions of the agreement as affecting the determination of the issue as to any covert purpose of the parties, concerning which we now express no opinion, it is clear that the mere *power* to thus appropriate the security in payment of the debt would not of itself give to the agreement the legal import of an absolute alienation of the land.

It is further suggested that this provision of the agreement placed it in the power of the stockholders, at their own will, to defeat the stipulated right of redemption, and to render valueless the nominal interest remaining in the corporation; because such a price might be fixed upon the land to be thus appropriated that the whole of the land would be absorbed in thus paying for and retiring the special stock. It is therefore urged that the instrument should be construed to have the effect of a complete alienation of the property. We cannot, from the terms of the agreement, declare this to be its legal effect. Whether, if the stockholders had all exercised this right of appropriation, the land would have been completely absorbed, neither the findings of the court nor the uncontroverted facts enable us to say. The actual value of the land is not found. It may have been of a value greater than the amount of special stock. If the trustees had made a dishonest appraisal of values, to the prejudice of the corporation, it would not have been bound, and might have had relief from the fraud.

But whether the real purpose of the parties was in accordance with the legal import of the agreement, or was of the character which the state alleges, is not to be determined alone from the terms of the agreement. The question which is in issue, whether or not there existed an indebtedness from the corporation to its members, to secure which was the alleged object of the agreement, the value, or at least the supposed value, of the land as compared with the amount of the alleged obligation, the relations and conduct of the parties, and perhaps other facts, are material, and should be considered in connection with the terms of the agreement as affecting the determination. But here, as seems evident, the court fell into an error which renders necessary a redetermination of the facts as to what was the real intention of the parties. The facts found include a determination, in accordance with the allegations of the complaint, of the existence of

an indebtedness from the corporation to its stockholders, to secure the payment of which the special stock was created, and the land devoted by the written agreement. The alleged indebtedness was put in issue by the answer, and the case, containing all of the evidence, presents no evidence supporting this averment of the complaint. The members of the corporation did not become its creditors by paying for the capital stock for which they had subscribed, nor did the non-payment of dividends make them creditors, if no dividends had been earned, and the evidence seems to show that none had been earned. There is no proof of the alleged fact that they had advanced money to the corporation in addition to the payments made for the capital stock. They were not, then, so far as the evidence shows, creditors of the corporation, or entitled to the security which is claimed to have been afforded by the transaction under consideration. The finding of the court to the contrary was of course erroneous, and the fact erroneously assumed was such that it may have affected the further determination of the court as to the real purpose of the parties, which is the principal question in dispute.

The trial court, proceeding from the assumed fact of an existing indebtedness, came to the conclusion, from the terms of the agreement and from the evidence in the case, that the real purpose of the parties was to give and to receive security in the nature of a mortgage; but we cannot presume that the same conclusion would have been reached if it had been considered that there was no indebtedness, no legal or equitable right, which the stockholders could assert against the corporation, or that the benefit secured to the stockholders by the agreement was a mere gratuity. In brief, it is not apparent that the conclusion of the court that the purpose was merely, in effect, to mortgage these lands as security, may not have been affected by the erroneous assumption and finding that there was a debt to be secured. Therefore there must be a new trial.

We would not be understood, from what has been said, as intimating that the effect of the agreement would *necessarily* be different from that declared by the court, if it should be considered that in fact there was no indebtedness. On the contrary, we think that if the corporation had created a lien upon its lands in favor of its stock-

holders to secure a mere bonus or gratuity, there being involved no intention of conferring upon them the real beneficial interest in the property, the lands, while remaining the property of the corporation, affected only by such lien, would not become taxable. But the fact erroneously assumed is still important in its bearing upon the issue as to whether this transaction was intended to accomplish the purposes of a security at all, or to confer upon the stockholders substantially the property in the lands under the cover and legal form of affording a mere security. The error may have affected the determination of this issue.

It is apparent, from the language of the decision of the court below, that this error resulted from the fact that the answer upon which the case had been tried had not been filed or presented to the court; and it being supposed that the fact of indebtedness was not denied, the allegation of the complaint was taken to be true. The point upon which our decision turns is not so distinctly presented in the appellants' brief as it should be, if relied upon; but we have concluded, rather from the whole tenor of the printed argument than from any distinct specification of the error, that the point is before us for decision.

Order reversed, and a new trial awarded.