St. Paul & Sioux City Railroad Company *vs.* George F. Robinson and another.

April 11, 1889.

**Taxes—Railway Lands.**—The facts found by the trial court, construed in connection with the written instrument set forth in the complaint, *held* to bring this case within the rule laid down in the case of the same plaintiff v. *McDonald*, 34 Minn. 182, and the lands in controversy are accordingly subject to taxation under Laws 1865, c. 15, § 5.

**Same—Former Judgment held not an Estoppel.**—*Held*, also, that the defendant in this action is not estopped by the judgment in the case referred to from setting up the facts relied on as a defence and from litigating the case on its merits.

Appeal by plaintiff from an order of the district court for Cottonwood county, *Perkins*, J., presiding, refusing a new trial. The ac-

tion was brought against the auditor and treasurer of Cottonwood county to set aside an assessment for taxation of a large quantity of lands in that county, (part of plaintiff's land grant,) to restrain the defendants from proceeding further in the levy or collection of such taxes, and to restrain the auditor from entering any of the lands for taxation for the current year.

*Gordon E. Cole* and *Daniel Rohrer,* for appellant.

*Moses E. Clapp,* Attorney General, *T. J. King, J. G. Redding,* and *F. F. Livermore,* for respondents.

VANDERBURGH, J.    A similar action was brought by the plaintiff against McDonald, auditor of Hennepin county, which was considered by this court on appeal, and reported in 34 Minn. 182, (25 N. W. Rep. 57.) Reference is made to the opinion in that case for a statement of the substance of the controversy, which involves the construction of the contract in question made by the plaintiff for the benefit of its stockholders, the execution of which, it is claimed by the defendants, has operated to separate the lands subject thereto from the body of plaintiff's land grant, and to transfer the equitable title and beneficial interest therein to the stockholders who are made the beneficiaries under such contract.    The contention of the defendants is that these lands are by virtue of such contract subject to taxation, under Laws 1865, *c.* 15, § 5.    In that case it was held that the form of the written instrument in question was not decisive of its nature and legal effect, which might depend upon the determination of certain material issues of fact raised by the pleadings.    No question in respect to the validity of such instrument, whether it be denominated a trust or a contract, is raised, nor is it disputed that it might be construed to be a mortgage or security for the obligations of the company, of whatever form, if such was its real character.    A new trial was ordered in the action referred to, because the record did not support the findings of the trial court upon material questions of fact necessary to be considered in determining the legal character of the obligation, and the purpose of the plaintiff in entering into it—in other words, the real nature of the transaction.    Among the questions which the court deemed material was that of the alleged indebtedness of the cor-

poration, and the value of the land selected and designated to be applied or disposed of in pursuance of the terms of the contract.

In the case at bar the findings of the court embrace all the facts necessary for a full and final determination of the case on its merits.

The issuance of the so-called "special stock" to the common stockholders of the company was a substantive part of the agreement, the object of which, we think, is shown by the record in this case to be the distribution of the lands, or their proceeds, among them in the manner thereby provided. The first section recites that the stock was issued for the purpose of providing the means of paying the debts of the company incurred in the construction of its railroad from St. Paul to St. James. It is designated "special land stock," and gave the holder no rights in the corporate property or management, but simply entitled him to his proportionate share and interest, to the amount of the face value thereof, in the proceeds of the lands set apart to be disposed of for the benefit of all the holders, and to be distributed among them. By section 6 it is provided as follows: "In consideration that the stockholders of the St. Paul & Sioux City R. R. Company have purchased and paid for the special stock herein provided, said company covenants and agrees with Wm. R. Marshall, as trustee for all the holders of stock issued in pursuance hereof, that the lands granted by congress to aid in the construction of the company's road, to the extent and quantity of 400,000 acres, are hereby set apart and specially appropriated to the payment of dividends and the final extinction and payment of the full par value of the stock issued under this agreement; and, to more fully secure the appropriation of said lands to that purpose, said company agrees to make and deliver herewith to Elias F. Drake an irrevocable power of attorney, authorizing said Drake, in the name of said company, as attorney in fact, to contract, sell, and convey any or all of said lands at his discretion, and apply the proceeds to the payment of dividends due on said stock, and the excess to the liquidation and reduction of the principal thereof, as herein provided, to be appropriated ratably on such stock." The decision and findings of the trial court affirm, upon sufficient evidence, so that they cannot be questioned here, that, notwithstanding the recitals in the agreement, which appear there-

from to be untrue, there was in fact no indebtedness due to the stockholders from the company, and no indebtedness or obligation was secured or intended to be secured or provided for by the issuance of the stock; nor was it issued to raise money or to provide means for the payment of the debts of the company; nor was it sold to them,—but the whole amount (24,000 shares) was delivered to the stockholders at the rate of $1 per share of $100, which charge is found to have been imposed and paid to defray the expenses incident to the trust, and as a mere nominal consideration. As found by the court, the truth appears to be that the common stock had not up to the time of the date of the agreement proved a profitable investment, and that by the construction of the portion of the road built, the company had earned the lands, and that 400,000 acres thereof might properly and equitably be distributed among the stockholders, in justice to them; and such a dividend, in conformity with the terms of the agreement, would not interfere with the security of the creditors or the success of the enterprise. As there was no one else to complain, it was a matter that concerned the stockholders alone. It will be observed that by section 3 of the contract the holders of the common stock are to receive one share of the special stock for each share of the common stock, thus duplicating the latter. In this contract the lands were estimated at $6 per acre, so that the value thereof, as so estimated, corresponded to the face value of the 24,000 shares of the stock, and the amount of land and stock was adjusted on that basis. The agreement also provided for dividends at the rate of 7 per cent. per annum from the current sales. The 11th section declares "the intent of the agreement to be that special stock shall be issued to the amount of $2,400,000, based on 400,000 acres of land, which are to be set apart specially, by description, as soon as convenient, and sold by the attorney in fact as trustee, under the direction of the board of directors of the St. Paul & Sioux City R. R. Co., or the trustees who may be chosen by the holders of the special stock, as hereinbefore provided, the proceeds to be applied to pay dividends, and the surplus from time to time to be distributed to pay the principal of said stock, and that the holders of said stock shall never be entitled to any dividend or interest in the property in the possession of the company, except as arises

from the lands herein set apart for that purpose." And the lands were accordingly so specifically set apart and designated, and the parcels described in the complaint and in controversy here are part of the same, still remaining unsold.

The so-called "stockholders" were practically given complete control of the property; that is to say, they were authorized to elect trustees at any time, who "might at pleasure remove any and all officers, agents, and servants employed in and about the management of said lands or property, and appoint others; also remove said land trustee and attorney in fact, and appoint others." They were also empowered "to control and direct the attorney in fact as to the price and manner of selling, and generally to do all such acts as the owner of the same might do." Until "such time as the holders of said special stock shall choose a board of trustees, the board of directors of the St. Paul & Sioux City R. R. Co. shall have power to do all the things pertaining to the duties of such trustees." Provision was also made for exchanging stock for lands upon terms consistent with the common rights of the stockholders. In other words, the stockholders, through the trustees, were invested with full disposing power, and could, through the attorney in fact, whose authority the company could not revoke, transfer the title to the lands; and, in case of a failure to appoint trustees, the directors of the company were invested with like powers, and in the execution thereof were not acting as officers of the company, but as trustees of the special stockholders, and the company simply held the bare legal title, without any power to interfere with the disposition thereof by such trustees in the lawful exercise of the discretion and authority vested in them.

The case might have seemed plainer if the lands had actually been conveyed to the trustees, but in its legal aspects it is the same. A stockholder is not by virtue of that relation a creditor of the corporation, and the special certificates issued to the common stockholders in this instance simply measured the interest of each in the lands, and represented no debt or obligation of the company, and secured none, and, it appears by the findings, was not intended to secure any, and gave them no corporate rights or interest whatever. As suggested in the case against McDonald, the term "stock," as applied to such

certificates, which are merely evidence of the respective interests of the beneficiaries in the lands, is not, strictly speaking, a proper one. But a moment's consideration will make it clear that the scheme adopted was a practicable one for a fair and equal division of the lands designated. A great number of parcels of wild land, lying in different counties, of unequal values, belonging to and to be distributed among a large number of persons having unequal interests, could hardly have been partitioned except through a sale thereof. And to render the undivided interests practically available to the owners pending the sale and appropriation of the proceeds, certificates, by whatever name called, would naturally and properly be issued to them.

In respect to the amount of the capital fund, the court finds that the value of the lands embraced in the trust, when created, did not, on the average, exceed $5 per acre, and the stock was worth not more than 60 per cent. of its face value. In view of the conflicting evidence upon which this conclusion is based, the extent of the plaintiff's land grant, and the amount of unimproved lands inviting purchasers, we think the finding sustained by the record, and that the estimate placed by the company upon the lands was all or more than they were worth. Sales have continued from year to year, and all but about $496,000 of the stock has been retired, leaving about 83,-000 acres still unsold. The rise in value has been insufficient to keep the stock from becoming greatly depreciated, and the dividends have been only partially provided for out of the yearly sales. There has at no time been any reasonable expectation of any residuary interest in the company.

Upon the whole record, and construing the terms of the contract with the evidence and the findings of the court hereinbefore referred to, we think, therefore, the further finding and conclusion of the trial court sustained, that the sole purpose of the execution of the contract and the issuance of the stock was to appropriate all the lands included in the trust, and to transfer the entire beneficial interest therein to the stockholders without reserve, notwithstanding the formal provision for a resulting interest and the reservation of an option for a redemption of the lands and a discharge of the trust in cer-

tain contingencies; that is to say, by the terms of the contract the holders of the stock so far controlled the appraisal and disposition of the lands as to enable them to deprive the corporation of any residuary or resulting interest therein, and, as a matter of fact, it was not the purpose of the company, in devising and executing this scheme for the benefit of the stockholders, to retain any such interest or any lien upon the lands. The real nature of the transaction is therefore apparent, and the instrument will not be held to be a mortgage. It secures no debt or obligation, or the performance of any act or duty.

Upon the facts found, therefore, this case is practically determined by the decision in that against McDonald, above referred to. We hold, then, that the instrument under consideration is in the nature of a contract for the disposition of these lands, and is fairly within the provisions of Laws 1865, c. 15, § 5, under which the exempt lands of plaintiff become taxable after they are contracted to be sold or conveyed. They are taxable in the hands of the trustees, and the taxes should be treated as part of the expenses of executing the trust.

2. In the case of this plaintiff against McDonald, above referred to, a new trial was granted by this court, which was subsequently had before the district court of Hennepin county, and upon the evidence adduced before the court upon that trial a decision was arrived at in that case, favorable to the plaintiff, and judgment for the relief sought was accordingly thereafter rendered by that court. It is now claimed on behalf of the plaintiff that the judgment in that action was a final determination of the questions at issue touching the lawful authority to tax the lands embraced within the contract under consideration, and binding upon all the municipal corporations and political subdivisions in the state, as well as those embraced within the county of Hennepin, and represented by its officers who were made parties to that action. We do not think that this contention can be supported. While the issues and subject-matter of the controversy are substantially the same, the parties are not. It is true that the proceedings for the levy and collection of taxes in the several counties are in behalf of the public, and in pursuance of the general laws, and hence are not unfrequently referred to as being prosecuted by the state.

But the state is not to be deemed a party thereto in any such sense as that, in a suit to restrain the officers of a municipal corporation or county from levying or enforcing the collection of taxes upon property within its limits, such officers can be held to represent all the other counties and subordinate political divisions of the state which have authority to levy taxes. The state is divided into counties, and besides cities and villages the counties are divided into towns and school-districts. These are all made corporations by law, with limited powers for the purpose of local self-government and the management of their own affairs, and vested with the authority to levy taxes for local purposes. In subordination to the state each of these corporations are separate and independent organizations, though exercising similar functions. They all have the right to hold property, to make contracts, and to sue and to be sued, as well as to levy taxes. Though they exercise the functions of government under the constitution and laws of the state, and are a part of the state, they are separate corporate entities, each acting independently within its own sphere, and through its own officers. Municipal corporations with special charters have more enlarged powers, yet, in exercising the power of taxation and of local administration, their authority differs only in degree from that of counties, towns, and school-districts. The interests of a particular locality can be best administered by its own inhabitants or the legally selected persons of their own choice, and the right to local self-government is one of the distinctive features of our republican system. Const. art. 3; Cooley, Const. Lim. *189, *190; *Patton* v. *Long,* 68 Pa. St. 260. And the constitution has imposed restrictions upon the state in respect to taxation, which are not imposed upon counties, towns, and cities. *Davidson* v. *County of Ramsey,* 18 Minn. 432, (482, 494.) Subject to certain limitations, these corporations determine for themselves the amount and purposes for which taxes shall be raised upon the property within their jurisdiction, and it is not unusual for the legislature to authorize such municipalities or districts to levy and collect its own taxes by separate proceedings, and wholly through its own officers. It was formerly so in the case of school-districts in this state. Pub. St. 1858, *c.* 23, § 66.

Under our present statutes, the county officers of each county, in

levying and collecting taxes, are *pro hac vice* the agents of the several local political subdivisions in the county, acting for them as well as for the county.   Gen. St. 1878, c. 11, §§ 49, 50, 54;   *City of St. Paul* v. *Colter*, 12 Minn. 16, (41, 51,) (90 Am. Dec. 278;)   *Guilder* v. *Town of Dayton*, 22 Minn. 366, 371.   Each county, city, town, and school-district is separately and peculiarly interested in the question as to the amount of property subject to taxation within its limits, both as respects the purposes of taxation and the rate.   They have each a right to be heard, then, upon the claim to exempt such property.   It is undoubtedly competent for the legislature to provide that, in a matter of public and general interest, the issues may be determined for the whole state in one action, in which shall be represented all interests and political subdivisions.   But such is not the nature of this case.   It is not material that the attorney general appeared in that action.   The rule is not thereby changed, and our attention has not been called to any statute giving such effect to a suit of this character, or any satisfactory authority supporting the proposition that an action brought against the officers of one county, city, or school-district, by the owners of lands therein, shall be notice to and bind all other similar bodies corporate in the state, whether they have any opportunity to be heard or not.   The local authorities of Cottonwood county had no legal notice of the suit by plaintiff against McDonald, had no opportunity to produce witnesses or be heard on the trial, and are not bound by the decision and judgment in that case.   *Adams* v. *Auditor General*, 43 Mich. 453, (5 N. W. Rep. 457.)   It is true that the decision in one such suit, in practice, frequently disposes of other similar cases as a precedent, if the facts are undisputed and the law arising thereon is fully and finally determined, because it would be idle to try other cases under such circumstances.   But that does not affect the question of the legal rights of other parties to litigate the questions of fact, or be heard in their own cases.   The decision, then, in the case referred to, cannot, we think, be held a conclusive bar to the assertion of defendants' rights in this action; and since the issues involved in this action are determined adversely to the plaintiff on the merits, it is not necessary to discuss the question whether, in view of the legal remedies afforded by our statute, an injunction may issue

to restrain the officers from proceeding to levy taxes upon real estate which are shown to be illegal.

Order affirmed.

NOTE. The case of *St. Paul & S. C. R. Co.* v. *Shanks*, an appeal from an order of *Severance*, J., in the district court for Martin county, involving the same questions with the foregoing case, was argued at the same time and by the same counsel as the foregoing case, and with the same result.